UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VERYL SWITZER | * | |
| 1412 Wreath Avenue | * | |
| Manhattan, Kansas  66503 | * | |
| | * | |
| A. GILLAN ALEXANDER | * | |
| 3057 – 390th Avenue | * | |
| Nicodemus, Kansas  67625 | * | |
| | * | |
| ROD BRADSHAW | * | |
| 704 Clay Street | * | |
| Jetmore, Kansas  67854 | * | CIVIL ACTION NO. |
| | * | |
| WILBURT HOWARD | * | |
| 1041 County Road AA | * | |
| Oakley, Kansas  67748 | * | |
| | * | |
| JOHN W. BOYD | * | |
| 68 Wind Road | * | CLASS ACTION |
| Baskerville, Virginia  23915 | * | |
| | * | |
| PHILIP HAYNIE | * | |
| 1015 Whays Creek Road | * | |
| Reedville, VA  22539 | * | |
| | * | |
| and | * | |
| | * | |
| JOHN DOES 1 THRU 22,000, | * | |
| individually and in their representative | * | |
| capacities on behalf of ALL | * | |
| SIMILARLY  SITUATED CLASS | * | |
| MEMBERS, | * | |
| | * | |
|   Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| AWB LIMITED | * | |
| 380 La Trobe Street | * | |
| Melbourne 3000, Victoria | * | |
| Australia | * | |

```
Serve:  Corporation Service Company      *
        285 Liberty St. NE               *
        Salem, OR  97301                 *
                                         *
AWB (U.S.A.) LIMITED                     *
6015W 2ND Avenue, Suite 1510             *
Portland, OR  97204                      *
Serve:  Corporation Service Company      *
        285 Liberty St. NE               *
        Salem, OR  97301                 *
                                         *
DEFENDANT DOES 1 THRU 100,               *
                                         *
        Defendants.                      *
```

## CLASS ACTION COMPLAINT

COME NOW the undersigned counsel of record for the above captioned Plaintiffs

and class representatives and hereby file this Complaint against the Defendants, showing the

Court as follows:

## INTRODUCTION

1.      This class action alleges that Defendants operated, maintained and

participated in an enterprise which engaged in a pattern of racketeering activity that injured

the business and property of the Plaintiffs in violation of 18 U.S.C. §1961 *et seq*. (the

Racketeer Influenced and Corrupt Organizations Act, or "RICO").   Through a private

corporation based in Australia and its United States subsidiary, the Defendants controlled the

entire Australian wheat export market and transacted legitimate business with one another

and others through American banking channels in New York while also operating a

racketeering enterprise aimed at harming the business of American wheat farmers.  Said

Defendants conspired with each other and with certain foreign entities to operate an

enterprise that engaged in a pattern of racketeering activity which involved repeated

violations of 18 U.S.C. §1957(a) (engaging in monetary transactions in criminally derived

property "derived from specified unlawful activity", as defined by 18 U.S.C. §1956), as well as 18 U.S.C. §1956 (which prohibits money laundering and includes violations of the Foreign Corrupt Practices Act as "specified unlawful activity" under both §1956 and 1957)— specifically, by committing the predicate RICO violations of receiving and laundering money derived from the unlawful bribery of foreign officials in violation of the Foreign Corrupt Practices Act.   Said racketeering activity enabled the Defendants to secure and maintain exclusive export markets and proximately caused economic injury to the property and business of the Plaintiffs and the members of the putative class, who were deliberately excluded from those markets as a direct result of said bribery and the continued concealment of said bribery as part of the Defendants' continuing pattern of racketeering activity.   This action seeks a permanent injunction against said unlawful conduct, compensatory and punitive damages, treble damages and attorneys fees as provided by RICO, and declaratory relief.

## <u>PARTIES</u>

2.    Plaintiff Veryl Switzer ("Plaintiff Switzer") is a 78-year-old wheat farmer from Nicodemus, KS.  Mr. Switzer is a U.S. citizen and at all times relevant to the period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on 800 acres of land in Nicodemus, KS.  At all times relevant to the facts that are the basis of this complaint, Plaintiff Switzer was a participating owner of his local co-op, which sold wheat directly on the global market.

3.    Plaintiff Gillam Alexander ("Plaintiff Alexander") is a 45-year-old wheat farmer from Nicodemus, KS.  Plaintiff Alexander is a U.S. citizen and at all times relevant to the period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on

2000 acres of land in Nicodemus, KS.  At all times relevant to the facts that are the basis of

this complaint, Plaintiff Alexander was a participating owner of his local co-op, which sold

wheat directly on the global market.

4.     Plaintiff Rod Bradshaw ("Plaintiff Bradshaw") is a 46-year-old wheat farmer

from Jerome, KS.  Plaintiff Bradshaw is a U.S. citizen and at all times relevant to the period

of time that is the subject of this case, namely 1999 until 2003, he grew wheat on 4000 acres

of land in Jerome, KS.  At all times relevant to the facts that are the basis of this complaint,

Plaintiff Bradshaw was a participating owner of his local co-op, which sold wheat directly on

the global market.

5.     Plaintiff Wilburt Howard ("Plaintiff Howard") is a 37-year-old former wheat

farmer from Oakley, KS.  Plaintiff Howard is a U.S. citizen and at all times relevant to the

period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on 1000

acres of land in Oakley, KS.  At all times relevant to the facts that are the basis of this

complaint, Plaintiff Howard was a participating owner of his local co-op, which sold wheat

directly on the global market.

6.     Plaintiff John Boyd ("Plaintiff Boyd") is a 40-year-old wheat farmer from

Baskerville, VA.  Plaintiff Howard is a U.S. citizen and at all times relevant to the period of

time that is the subject of this case, namely 1999 until 2003, he grew wheat on 1000 acres of

land in Baskerville, VA.  At all times relevant to the facts that are the basis of this complaint,

Plaintiff Howard was a participating owner of his local co-op, which sold wheat directly on

the global market.

7.     Plaintiff Phillip Haynie ("Plaintiff Haynie") is a 52-year-old wheat farmer

from Heathsville, VA.  Plaintiff Haynie is a U.S. citizen and at all times relevant to the

period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on several thousand acres of land in or near Heathsville, VA. At all times relevant to the facts that are the basis of this complaint, Plaintiff Haynie was a participating owner of his local co-op, which sold wheat directly on the global market.

8.    Plaintiffs John Doe Nos. 1-20,000 are the Class of persons who (a) are U.S. wheat farmers; (b) are participant owners in co-ops that sell their wheat directly on the global market; and (c) have suffered direct economic damages due to lost business and business opportunity which was proximately caused by the unlawful or tortious conduct of the Defendants and the RICO violations described herein.

9.    Plaintiffs John Doe Nos. 20,001-22,000 are the Class of persons and/or business entities who (a) purchase wheat in the U.S. and abroad; (b) sell wheat directly on the global market; and (c) have suffered direct economic damages due to lost business and business opportunity which was proximately caused by the unlawful or tortious conduct of the Defendants and the RICO violations described herein.

10.    Plaintiffs reserve the right to identify additional classes or subclasses and move for leave of Court to add such additional classes or subclasses by amendment.

11.    Defendant AWB LIMITED (hereinafter "Defendant AWB") is a publicly traded foreign corporation with headquarters located at 380 La Trobe Street, Melbourne 3000, Victoria, Australia (the initials "AWB" stand for Australian Wheat Board, a predecessor entity), and which wholly owns and controls AWB USA LTD, a domestic subsidiary based in Portland, Oregon. Defendant AWB acted at all times relevant to this action through individual agents and employees, who are hereinafter subsumed within the term "Defendant AWB."

12.     Defendant AWB (U.S.A.) LIMITED (hereinafter "Defendant AWB USA") is a subsidiary wholly owned and controlled by Defendant AWB.  Defendant AWB USA was formed and incorporated under the laws of Delaware with its headquarters located at ODS Tower, Suite 1510, 601 SW Second Avenue, Portland, Oregon.

13.     Defendant Does 1-50 are unknown agents and/or employees of Defendant AWB who participated in the racketeering activity and unlawful or tortious acts described herein which directly and proximately caused economic injury to Plaintiffs' business and property.   The actual identities of Defendant Does 1-50 are unknown to the Plaintiffs but readily known to Defendant AWB and will be provided by amendment once ascertained through discovery.

14.     At all times relevant to the allegations that are the basis of his complaint, Defendant AWB employed and directed the actions of Defendant Does 1-50, whose conduct at all times relevant herein was within the scope of said agency or employment such that Defendant AWB is vicariously liable for the unlawful conduct of said Doe  Defendants.

15.     Defendant Does 51-100 are unknown agents and/or employees of Defendant AWB USA who participated in the racketeering activity and unlawful or tortious acts described herein which directly and proximately caused economic injury to Plaintiffs' business and property. The actual identities of Defendant Does 51-100 are unknown to the Plaintiffs but readily known to Defendant AWB USA and will be provided by amendment once ascertained through discovery.

16.      At all times relevant to the allegations that are the basis of this Complaint, Defendant AWB USA employed and directed the actions of Defendant Does 51-100, whose conduct at all times relevant herein was within the scope of said agency or employment such

that Defendant AWB USA is vicariously liable for the unlawful conduct of said Doe Defendants.

17.    Each of the Defendants was the agent, employee and/or joint venturer, or working in concert with, other Defendant and was acting within the course and scope of such agency, employment and/or joint venture or concerted activity.  To the extent that any particular act was perpetrated by a certain Defendant or Defendants, the remaining Defendant or Defendants confirmed and ratified the same.

18.    Each Defendant conspired with other Defendants by agreeing to commit wrongful and tortious acts and to engage in the pattern of racketeering activity described herein, and each Defendant participated in or committed a wrongful act in furtherance of said conspiracy that resulted in actionable injury to the Plaintiffs.

## JURISDICTION AND VENUE

19.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. §1332 (diversity of citizenship), 28 U.S.C. §1367 (pendant or supplemental jurisdiction), and 18 U.S.C. §1964 (Racketeer Influenced and Corrupt Organizations Act, hereafter "RICO").

20.    Venue is proper pursuant to 28 U.S.C. §1391 and other applicable law.

## CLASS ACTION ALLEGATIONS

21.    This action should be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(2), which permits the certification of a class when the defendants "have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final

injunctive relief or corresponding declaratory relief with respect to the class as a whole…" Fed R. Civ. P. 23(b)(2).

22.    This action should be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(A), which permits the certification of a class if the lack of a class could lead to inconsistent or varying adjudication with respect to individual members which would establish incompatible standards of conduct for the defendants.

23.    This action should be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(B), which permits the certification of a class when adjudication with respect to individual Plaintiffs would, as a practical matter, be dispositive of the interests of the other putative Class Members.

24.    This action should be certified as a class action pursuant to Fed R. Civ. P. 23(b)(3) because common questions of law and fact predominate over any questions affecting only individual members and a class action is superior to other methods for the fair and efficient adjudication of the controversy.

25.    This action should be certified as a class because Plaintiffs satisfy all of the prerequisites to a class action set forth in Fed. R. Civ. P. 23(a).  Specifically,

  a.  The class is so numerous that joinder of all members is impracticable;

  b.  There are questions of law common to the class;

  c.  There are questions of fact common to the class;

  d.  The claims of the named Plaintiffs are typical of the claims of the class; and

  e.  The representative parties will fairly and adequately protect the interests of the class.

26.    In addition to being certifiable, this action is maintainable as a class action.

27.    Plaintiffs' counsel has had prior experience with class action litigation, is capable of bringing a class action suit, and will capably represent the interests of the class.

## ALLEGATIONS OF FACT

### *GENERAL ALLEGATIONS*

28.    Since 1999, Defendant AWB LTD has served as the exclusive manager and marketer of all Australian bulk wheat exports.

29.    Defendant AWB LTD is a private corporate entity which was formed to replace the Australian Wheat Board, a statutory body of the Australian government which was responsible for controlling the domestic and export marketing of Australian wheat from 1939 to 1999.

30.    In August 2001, AWB LTD was placed on the Australian Stock Exchange as a publicly traded company.

31.    AWB LTD is one of the largest registered future traders in the United States.

32.    AWB owns and controls numerous subsidiary companies throughout the world, including a United States subsidiary, AWB USA LTD (hereafter AWB USA).

33.    AWB USA was incorporated in the State of Delaware and is headquartered in Portland, Oregon.

34.    As a U.S. company, AWB USA participated in the USDA export credit program.

35.    In order to obtain favorable contracts and secure markets for Australian wheat, Defendant AWB LTD (hereafter AWB) has paid bribes and kickbacks to foreign governments, committed fraud, and laundered money.

36.     In order to exclude American wheat growers from certain markets and to sabotage business opportunities for American growers, Defendant AWB has paid bribes and kickbacks to foreign governments, committed fraud, and laundered money.

37.     At all times relevant herein, Defendants have operated, maintained and participated in an enterprise engaged in racketeering activity which has caused injury to the business and property of the Plaintiffs and Plaintiffs' class and which is described more particularly below.

### BRIBERY OF YEMEN OFFICIALS

38.     In 1999, AWB officials bribed Yemenese government officials in order to secure a contract to export wheat to Yemen.

### BRIBERY OF PAKISTANI OFFICIALS

39.     In 2001, AWB LTD officials bribed Pakistani government officials in order to secure a contract to export wheat to Pakistan.

### FRAUDULENT DEBT RECOVERY WITH LAUNDERED FUNDS

40.     In 2001, the Australian mining company, BHP Billiton, loaned $8 million for the purchase of wheat to the government of Iraq in order to gain favor with the Hussein regime in BHP's attempt to obtain oil business in Iraq.

41.     The Iraqi government failed to directly repay the $8 million loan to BHP.

42.     BHP Billiton contracted with an Australian oil company, Tigris Petroleum, to recover the $8 million debt.

43.     In 2001, AWB fraudulently inflated the costs of a wheat shipment to Iraq by $8 million dollars to recoup the aforementioned debt under false pretenses.

44.     The invoice for said fraudulently inflated costs was transmitted via wire or mail from AWB in Australia to the United Nations (UN) in New York.

45.     In response to the fraudulent AWB invoice, the New York branch of BNP paid AWB an inflated cost for a wheat shipment through a UN escrow account.

46.     AWB laundered the excess $8 million fraudulent overpayment to BHP Billiton as recovery of the aforementioned Iraqi debt.

### *FRAUDULENT SABOTAGE OF INDONESIAN MARKET*

47.     In 2002, Defendant AWB USA entered into a contract with a private Indonesian company to export soybeans to the Indonesian company.

48.     Said Indonesian company defaulted on the contract; consequently, through the USDA export credit program, AWB USA applied for and received $14 million in U.S. subsidies.

49.     AWB USA illegally and fraudulently received these subsidies, despite the fact that a substantial portion of the payment price of the wheat deal had in fact been paid by the Indonesian company to AWB.

50.     As a result of the problems with the AWB USA/Indonesia soybean deal, the USDA banned US exporters from using the export credit program in deals with any companies from Indonesia.

51.     AWB USA, upon the instruction of its parent company AWB, effectively scuttled a substantial portion of the US/Indonesian grain trade.

52.     Once the USDA export credit ban on Indonesia was implemented and US competition was significantly lessened, AWB LTD by-passed AWB USA LTD and entered into multiple grain deals directly with Indonesian companies.

### *FRAUDULENT ABUSE OF U.N. OIL-FOR-FOOD PROGRAMME*

53.    As a result of the government of Iraq's persistent and continued violations of post-Persian Gulf War U.N. sanctions, the U.N. imposed an embargo against the government of Iraq.

54.    In order to lessen the effect of the embargo on the citizens of Iraq, the UN established the UN Oil-for-Food Programme, which allowed goods and services for humanitarian purposes to be exchanged with Iraq through the U.N.

55.    The UN established the Programme's primary escrow account with BNP (Banco de Nationale de Paris).

56.    Another escrow account for the Programme was with J.P. Morgan Chase in New York.

57.    On multiple occasions AWB LTD submitted via wire or mail fraudulent misinformation to the 661 Committee of the Programme in New York, NY in the United States.

58.    More specifically said fraudulent misinforming communications included, but were not limited to, inflated valuations of project wheat shipments to Iraq, knowingly misleading communications that failed to alert the UN of substantial after-service fees, knowingly misleading communications that failed to alert the UN of AWB's knowledge that payment of said after-service fees where going to Iraqi governmental agencies, etc.

59.    The Programme operated from 1997 until the end of the war in Iraq in 2003.

60.    AWB LTD was the single largest provider of humanitarian goods to Iraq under the Programme, selling a total of 6.8 million tons of wheat to Iraq and receiving a total of $2.3 billion in payments from the United Nations escrow account.

12

61.     Payments to AWB resultant from their fraudulent communications to the UN were made to AWB from the U.S. New York branch of BNP and, upon information and belief, the New York branch of J.P. Morgan Chase bank.

### BRIBERY OF IRAQI OFFICIALS DISGUISED AS COSTS AND FEES

62.     From 1997 until July 1999 AWB's contracts with the Iraqi Grain Board required shipment of its wheat only up to the point of entry to Iraq, the port of Umm Qasr.

63.     In July 1999 AWB and the Iraqi Grain Board agreed to a new contractual term requiring AWB to assume the cost of inland transportation to points within Iraq from the port of Umm Qasr.

64.     The inland transportation provisions became standard in all AWB contracts for the remainder of the Programme.

65.     Alia is a Jordanian based company that was purportedly responsible for transportation of wheat that was shipped by AWB to Iraq.

66.     Forty-nine (49%) ownership of Alia was controlled by the Trade Ministry of Iraq.

67.     The Jordanian principles of Alia had no transportation experience.

68.     Iraqi governmental employees performed all duties relevant to Iraq inland transportation of AWB wheat shipments.

69.     From late 1999 to mid-2000, transport costs ranged between $10.80 and $12 per metric ton (pmt).

70.     In 2000, the costs increased to between $14 and $15 pmt.

71.     From 2001 until the spring of 2003 the transportation costs spiraled to between $45 and $56 pmt.

72.    These transport fees were in fact bribes from AWB to the Iraqi government and/or government officials in return for which AWB maintained a virtual monopoly of the Iraq wheat import business.

### OBSTRUCTION OF JUSTICE

73.    At all times relevant herein, numerous AWB officials were aware that AWB was paying bribes to Iraqi government agencies and/or officials.

74.    Due to the overwhelming number of allegations of violations of the UN Oil-for-Food Programme the U.N. designated an independent evaluation of the entire program, "The Independent Inquiry Committee into the United Nations Oil-for-Food Programme" (hereinafter referred to at times and "The Volker Report"), the results of which were released on October 27, 2005.

75.    The Volker Report showed that AWB was the most egregious abuser of all participants in the entire Programme, constituting 14% of all kick-backs paid to the Iraqi government through the Programme.

76.    The Volker Report uncovered numerous documents that suggested that AWB LTD official knew that the transportation fees and after-service fees paid were in fact going to the Iraqi government.

77.    As a result of the Volker Report, in mid-January 2006 the Australian Government designated former Australian judge from the New South Wales Court of Appeals Judge Terence Cole to conduct an independent investigation into AWB and their role in the UN Oil-for-Food scandal (hereinafter referred to at times as the "Cole Commission").

78.    During this inquiry a number of AWB officials were put under oath and compelled to testify about AWB's role in the scandal.

79.    A number of these AWB officials and other conspirators conspired to and attempted to obstruct justice by attempting to cover-up AWB's role in the scandal.  Said obstruction was implemented via the commission of perjury and other efforts to obfuscate the truth.

80.    During testimony before the Cole Commission, Andrew Lindberg, the former CEO and managing director of AWB LTD, admitted that AWB payments to Alia were indeed being forwarded to agents of Saddam Hussein's regime in the Iraqi government.

81.    The Cole Commission's inquiry in Australia is ongoing.

### CONSPIRACY TO EXCLUDE PLAINTIFFS FROM CERTAIN MARKETS

82.    Defendants knew or should have known that United States domestic and international law governing the conduct of AWB and its subsidiaries in engaging in the business of grain exporting prohibits them from engaging in bribery, wire and mail fraud, financial institution fraud, money laundering, obstruction of justice, violations of the Foreign Corrupt Practices Act, and other forms of racketeering activity.

83.    Upon information and belief, certain AWB officials, employees and/or agents of Defendants intentionally and knowingly conspired to utilize illegal tactics such as wire fraud, bank fraud, bribery, money laundering and tortious interference with business opportunity in order to gain an unfair competitive advantage in certain wheat markets including, but not limited to, Iraq, Pakistan, Yemen and Indonesia.

84.    Said Defendants, AWB officials, employees and/or agents, Alia officials, Alia employees and/or agent, Iraqi government agencies, Iraqi government officials and/or agents,

Yemenese government agencies, Yemenese government employees and/or agents, Pakistani government agencies and Pakistani government employees and/or agents who conspired to engage in wire fraud, bank fraud, bribery, money laundering and tortious interference with business opportunity in order to position AWB to have an unfair competitive advantage against AWB competitors are hereinafter referred to as "conspirators" or "co-conspirators," or as subsumed within the term "AWB Unfair Advantage Conspirators" defined below.

85.     AWB Unfair Advantage Conspirators that knowingly participated in AWB's illegal efforts to corner specific wheat markets were intent on ensuring that their methods to effect the same were not hampered by efforts to comply with the mandates of United States domestic and international laws.

86.     AWB Unfair Advantage Conspirators formed an ongoing criminal enterprise designed to implement tactics known to violate international laws and U.S. domestic laws in order to affect an unfair competitive advantage for AWB in specific international wheat markets to the detriment of Plaintiffs (hereinafter "AWB Unfair Advantage Conspiracy").

87.     This criminal enterprise was premised on the fact that AWB Unfair Advantage Conspirators knew and intended for AWB to realize monetary benefits from affecting an unfair competitive advantage for AWB in specific international wheat markets.

88.     The AWB Unfair Advantage Conspiracy began in or around 1996 and is on-going.

89.     Certain Defendants, AWB officials and senior management had relationships that assisted in the formation, implementation and continuation of the  AWB Unfair Advantage Conspiracy.  Upon information and belief that these relationships were formed and fostered by meetings, telephonic discussions, in-person discussions, e-mail

communications, facsimile communications, wiring communication,  and other communications that occurred in, among other places, Oregon and New York.

90.    The corporate Defendant formed and implanted the AWB Unfair Advantage Conspiracy in order to make money selling wheat to specific international wheat markets and in order to gain a competitive advantage in said specific markets.

91.    The individual Defendant formed and implemented the AWB Unfair Advantage Conspiracy in order to obtain personal financial rewards and/or financial rewards for their employers.

92.    The AWB Unfair Advantage Conspiracy was successful in achieving its unlawful ends.  With assistance from certain conspiring individuals and/or organizations, Defendant were able to reap handsome monetary rewards in exchange for participating in the AWB Unfair Advantage Conspiracy which includes, but is not limited to, acts of bribery, wire or mail fraud, financial institution fraud,  money-laundering, obstruction of justice, and violations of the Foreign Corrupt Practices Act to the economic detriment of Plaintiffs.

93.    During the period of 1996 to the present, upon information and belief, Defendant AWB earned millions of dollars in revenue from the AWB Unfair Advantage Conspiracy.  These fruits of the AWB Unfair Advantage Conspiracy have been invested in the ongoing operations of Defendants AWB and AWB USA.

94.    Upon information and belief, each individual Defendant, through their participation in the AWB Unfair Advantage Conspiracy, earned far more money per contract, per annum or per hour than they could otherwise have earned, absent the AWB Unfair Advantage Conspiracy.

95.    Upon information and belief, the corporate Defendants also benefited financially by forming the AWB Unfair Advantage Conspiracy because their co-conspirators used their influence to ensure that the corporate Defendants were awarded contracts or modifications in existing contracts devoid of fair competition that would have existed, absent the AWB Unfair Advantage Conspiracy.

96.    Numerous acts of racketeering activity have been committed by the conspirators (and others acting at their direction) in their implementation of the AWB Unfair Advantage Conspiracy, including but not limited to financial institution fraud, wire or mail fraud, bribery, money laundering, and violations of the Foreign Corrupt Practices Act.

97.    As part of the aforementioned Conspiracy, the Defendants committed repeated violations of 18 U.S.C. §1957(a) (engaging in monetary transactions in criminally derived property "derived from specified unlawful activity", as defined by 18 U.S.C. §1956), as well as 18 U.S.C. §1956 (which prohibits money laundering and includes violations of the Foreign Corrupt Practices Act as "specified unlawful activity" under both §1956 and 1957)— specifically, by committing RICO predicate acts of receiving and laundering money derived from the unlawful bribery of foreign officials in violation of the Foreign Corrupt Practices Act which were intended to cause economic harm to the Plaintiffs and Plaintiffs' putative class.

98.    Upon information and belief, the AWB Unfair Competition Conspiracy effectively deprived the Plaintiffs and Plaintiffs' class of any meaningful opportunity to export wheat to Iraq via the U.N. Oil-for-Food Programme.

### INJURIES SUFFERED BY PLAINTIFFS

99.     Plaintiff Switzer is a wheat farmer from Nicodemus, KS.  Mr. Switzer is a U.S. citizen and at all times relevant to the period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on 800 acres of land in Nicodemus, KS.  At all times relevant to the facts that are the basis of this complaint, Plaintiff Switzer was a participating owner of his local co-op, Mid-West Co-op in Quinter, KS, which sold wheat directly on the global market. Upon information and belief, Plaintiff Switzer, absent the AWB Unfair Competition Conspiracy, would have attempted to sell wheat via his co-op to Iraqi buyers. As a proximate result of the AWB Unfair Competition Conspiracy, Plaintiff Switzer was unlawfully excluded from certain foreign markets, deprived of business opportunities, and injured in his business and property.  He has suffered, and continues to suffer, economic losses for which he is entitled to both monetary damages and equitable relief.

100.     Plaintiff Gillam Alexander ("Plaintiff Alexander") is a 45-year-old wheat farmer from Nicodemus, KS.  Plaintiff Alexander is a U.S. citizen and at all times relevant to the period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on 2000 acres of land in Nicodemus, KS.  At all times relevant to the facts that are the basis of this complaint, Plaintiff Alexander was a participating owner of his local co-op, which sold wheat directly on the global market.   Upon information and belief, Plaintiff Alexander, absent the AWB Unfair Competition Conspiracy, would have attempted to sell wheat via his co-op to Iraqi buyers.  As a proximate result of the AWB Unfair Competition Conspiracy, Plaintiff Alexander was unlawfully excluded from certain foreign markets, deprived of business opportunities, and injured in his business and property.  He has suffered, and continues to suffer, economic losses for which he is entitled to both monetary damages and equitable relief.

101.    Plaintiff Rod Bradshaw ("Plaintiff Bradshaw") is a 46-year-old wheat farmer from Jerome, KS.  Plaintiff Bradshaw is a U.S. citizen and at all times relevant to the period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on 4000 acres of land in Jerome, KS.  At all times relevant to the facts that are the basis of this complaint, Plaintiff Bradshaw was a participating owner of his local co-op, which sold wheat directly on the global market.  Upon information and belief, Plaintiff Bradshaw, absent the AWB Unfair Competition Conspiracy, would have attempted to sell wheat via his co-op to Iraqi buyers. As a proximate result of the AWB Unfair Competition Conspiracy, Plaintiff Bradshaw was unlawfully excluded from certain foreign markets, deprived of business opportunities, and injured in his business and property.  He has suffered, and continues to suffer, economic losses for which he is entitled to both monetary damages and equitable relief.

102.    Plaintiff Wilburt Howard ("Plaintiff Howard") is a 37-year-old former wheat farmer from Oakley, KS.  Plaintiff Howard is a U.S. citizen and at all times relevant to the period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on 1000 acres of land in Oakley, KS.  At all times relevant to the facts that are the basis of this complaint, Plaintiff Howard was a participating owner of his local co-op, which sold wheat directly on the global market.   Upon information and belief, Plaintiff Howard, absent the AWB Unfair Competition Conspiracy, would have attempted to sell wheat via his co-op to Iraqi buyers.  As a proximate result of the AWB Unfair Competition Conspiracy, Plaintiff Howard was unlawfully excluded from certain foreign markets, deprived of business opportunities, and injured in his business and property.  He has suffered, and continues to suffer, economic losses for which he is entitled to both monetary damages and equitable relief.

103.     Plaintiff John Boyd ("Plaintiff Boyd") is a 40-year-old wheat farmer from Baskerville, VA.  Plaintiff Howard is a U.S. citizen and at all times relevant to the period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on 1000 acres of land in Baskerville, VA.  At all times relevant to the facts that are the basis of this complaint, Plaintiff Boyd was a participating owner of his local co-op, which sold wheat directly on the global market.    Upon information and belief, Plaintiff Boyd, absent the AWB Unfair Competition Conspiracy, would have attempted to sell wheat via his co-op to Iraqi buyers. As a proximate result of the AWB Unfair Competition Conspiracy, Plaintiff Boyd was unlawfully excluded from certain foreign markets, deprived of business opportunities, and injured in his business and property.  He has suffered, and continues to suffer, economic losses for which he is entitled to both monetary damages and equitable relief.

104.     Plaintiff Phillip Haynie ("Plaintiff Haynie") is a 52-year-old wheat farmer from Heathsville, VA.  Plaintiff Haynie is a U.S. citizen and at all times relevant to the period of time that is the subject of this case, namely 1999 until 2003, he grew wheat on several thousand acres in or near Heathsville, VA.  At all times relevant to the facts that are the basis of this complaint, Plaintiff Haynie was a participating owner of his local co-op, which sold wheat directly on the global market.    Upon information and belief, Plaintiff Haynie, absent the AWB Unfair Competition Conspiracy, would have attempted to sell wheat via his co-op to Iraqi buyers.  As a proximate result of the AWB Unfair Competition Conspiracy, Plaintiff Haynie was unlawfully excluded from certain foreign markets, deprived of business opportunities, and injured in his business and property.  He has suffered, and continues to suffer, economic losses for which he is entitled to both monetary damages and equitable relief.

105.    Plaintiffs John Doe Nos. 1-20,000 are the Class of persons who (a) are U.S. wheat farmers; (b) are participant owners in co-ops that sell their wheat directly on the global market; and (c) have suffered direct economic damages due to lost business and business opportunity as a result of the scheme and enterprise involving (but was not limited to) bribery, fraud, money laundering, wire and/or mail fraud, financial institution fraud, obstruction of justice, violations of the Foreign Corrupt Practices Act, and other racketeering activity.  Upon information and belief, said John Doe Plaintiffs, absent the AWB Unfair Competition Conspiracy, would have attempted to sell wheat via their co-ops to Iraqi buyers. As a proximate result of the AWB Unfair Competition Conspiracy, said John Doe Plaintiffs were unlawfully excluded from certain foreign markets, deprived of business opportunities, and injured in their business and property.  They have suffered, and continue to suffer, economic losses for which they are entitled to both monetary damages and equitable relief.

106.    Plaintiffs John Doe Nos. 20,001-22,000 are the Class of persons and/or business entities who (a) purchase wheat in the U.S. and abroad; (b) sell wheat directly on the global market; and (c) have suffered direct economic damages due to lost business and business opportunity as a result of the scheme and enterprise involving (but was not limited to) bribery, fraud, money laundering, wire and/or fraud, financial institution fraud, obstruction of justice, violations of the Foreign Corrupt Practices Act, and other racketeering activity.  Upon information and belief, said John Doe Plaintiffs, absent the AWB Unfair Competition Conspiracy, would have attempted to sell wheat directly or indirectly to Iraqi buyers.  As a proximate result of the AWB Unfair Competition Conspiracy, said John Doe Plaintiffs were unlawfully excluded from certain foreign markets, deprived of business opportunities, and injured in their business and property.  They have suffered, and continue

to suffer, economic losses for which they are entitled to both monetary damages and

equitable relief.

## THEORIES OF RECOVERY

### COUNT I – VIOLATION OF 18 U.S.C. 1962(a)

107.    All preceding paragraphs are hereby incorporated by reference as if fully set

forth herein.

108.    Defendants AWB and AWB USA, together with the individual Defendants,

violated § 1962(a) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. §§ 1961-1968, which provides as follows:

> (a) It shall be unlawful for any person who has received any income derived,
> directly or indirectly, from a pattern of racketeering activity … in which such
> person has participated as a principal within the meaning of section 2, title 18,
> United States Code, to use or invest, directly or indirectly, any part of such
> income, or the proceeds of such income, in acquisition of any interest in, or the
> establishment or operation of, any enterprise which is engaged in, or the activities
> of which affect, interstate or foreign commerce.

109.    Defendants AWB and AWB USA continuously and on numerous occasions

engaged in a pattern of racketeering activity which included predicate acts of engaging in

monetary transactions in criminally derived property "derived from specified unlawful

activity" in violation of 18 U.S.C. §1957(a), and money laundering thru falsified invoices

and financial instruments to conceal the true nature of proceeds derived from bribery in

violation of 18 U.S.C. §1956.

110.    The aforementioned pattern of racketeering activity furthered the Defendants'

conspiracy to bribe Iraqi officials in violation of the Foreign Corrupt Practices Act and

enabled the Defendants to continue to surreptitiously pay such bribes with the intention of

securing an exclusive market, which would exclude American growers and cause direct economic injury to the Plaintiffs and Plaintiffs' class.

111.    The combined business efforts of the Defendants constitute an ongoing Enterprise as that term is defined by RICO.  The Enterprise is an ongoing organization that continues to function as a unit and engage in activity separate and apart from the criminal and illegal activity.  The Enterprise operated, and continues to operate, legitimate business, which includes business in the United States.

112.    Defendant AWB, AWB USA and the Individual Defendants together with the co-conspiring Alia representative, Iraqi government representatives, BHP Billiton representatives, Yemenis government representative, Pakistani government representatives, Indonesian private citizens, etc. worked together oftentimes on a repeated and continuous basis to engage in the illegal racketeering activity.  The predicate acts described above include bribery of foreign officials, engaging in monetary transactions with funds derived from bribery, and the laundering of bribery proceeds in order to further and continue the goal of the Enterprise to exclude and harm the Plaintiffs and Plaintiffs' class.

113.    Defendants were and continue to be associated with and employed by the Enterprise.

114.    Defendants directed that employees employed by the Enterprise engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

115.    The Enterprise and the participating Defendants have in fact engaged in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

116.    The Enterprise has earned billions of dollars in exchange for participating with co-conspiring government and private company officials in the racketeering activities

described above.  The Enterprise and the co-conspirators designed and implemented the

AWB Unfair Competition Conspiracy in order to receive billions of dollars in wheat sales

that would not have been received through the Enterprise's legitimate conduct of business.

117.    Plaintiff Switzer, Plaintiff Alexander, Plaintiff Bradshaw, Plaintiff Howard,

Plaintiff Boyd, Plaintiff Haynie, and the members of the putative Plaintiff class have all been

injured in their business or property, as required by 18 U.S.C. § 1964(c).  The impact caused

by Defendants' pattern and practice of criminal conduct, if not remedied by the Court, will

continue to harm the named Plaintiffs and putative RICO Class Members.

118.    The Enterprise's victims include all persons and/or concerns that have

suffered direct economic and non-economic damages from the AWB Unfair Competition

Conspiracy.

119.    As a direct and proximate result of the AWB Unfair Competition

Conspirators' actions as aforesaid, individually named Plaintiffs and the putative RICO Class

have been damaged in an amount to be determined at trial.

### COUNT II – VIOLATION OF 18 U.S.C. 1962(c)

120.    All preceding paragraphs are hereby incorporated by reference as if fully set

forth herein.

121.    Defendants AWB and AWB USA, together with the individual Defendants,

violated §1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. §§ 1961-1968, which provides as follows:

(c) It shall be unlawful for any person employed by or associated with any enterprise
engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or
participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern
of racketeering activity or collection of unlawful debt.

122.     Defendants AWB and AWB USA continuously and on numerous occasions engaged in a pattern of racketeering activity which included predicate acts of engaging in monetary transactions in criminally derived property "derived from specified unlawful activity" in violation of 18 U.S.C. §1957(a), and money laundering thru falsified invoices and financial instruments to conceal the true nature of proceeds derived from bribery in violation of 18 U.S.C. §1956.

123.     The aforementioned pattern of racketeering activity furthered the Defendants' conspiracy to bribe Iraqi officials in violation of the Foreign Corrupt Practices Act and enabled the Defendants to continue to surreptitiously pay such bribes with the intention of securing an exclusive market, which would exclude American growers and cause direct economic injury to the Plaintiffs and Plaintiffs' class.

124.     The combined business efforts of the Defendants constitute an ongoing Enterprise as that term is defined by RICO.  The Enterprise is an ongoing organization that continues to function as a unit and engage in activity separate and apart from the criminal and illegal activity.  The Enterprise operated, and continues to operate, legitimate business, which includes business in the United States.

125.     Defendant AWB, AWB USA and the Individual Defendants together with the co-conspiring Alia representative, Iraqi government representatives, BHP Billiton representatives, Yemenis government representative, Pakistani government representatives, Indonesian private citizens, etc. worked together oftentimes on a repeated and continuous basis to engage in the illegal racketeering activity.  The predicate acts described above include bribery of foreign officials, engaging in monetary transactions with funds derived

from bribery, and the laundering of bribery proceeds in order to further and continue the goal of the Enterprise to exclude and harm the Plaintiffs and Plaintiffs' class.

126.    Defendants were and continue to be associated with and employed by the Enterprise.

127.    Defendants directed that employees employed by the Enterprise engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

128.    The Enterprise and the participating Defendants have in fact engaged in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

129.    The Enterprise has earned billions of dollars in exchange for participating with co-conspiring government and private company officials in the racketeering activities described above.  The Enterprise and the co-conspirators designed and implemented the AWB Unfair Competition Conspiracy in order to receive billions of dollars in wheat sales that would not have been received through the Enterprise's legitimate conduct of business.

130.    Plaintiff Switzer, Plaintiff Alexander, Plaintiff Bradshaw, Plaintiff Howard, Plaintiff Boyd, Plaintiff Haynie, and the members of the putative Plaintiff class have all been injured in their business or property, as required by 18 U.S.C. § 1964(c).  The impact caused by Defendants' pattern and practice of criminal conduct, if not remedied by the Court, will continue to harm the named Plaintiffs and putative RICO Class Members.

131.    The Enterprise's victims include all persons and/or concerns that have suffered direct economic and non-economic damages from the AWB Unfair Competition Conspiracy.

132.    As a direct and proximate result of the AWB Unfair Competition Conspirators' actions as aforesaid, individually named Plaintiffs and the putative RICO Class have been damaged in an amount to be determined at trial.

### COUNT III – VIOLATION OF 18 U.S.C. 1962(d)

133.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

134.    Defendants AWB and AWB USA, together with the individual Defendants, violate §1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which provides as follows:

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

135.    Defendants AWB and AWB USA continuously and on numerous occasions conspired to engage in a pattern of racketeering activity which included predicate acts of engaging in monetary transactions in criminally derived property "derived from specified unlawful activity" in violation of 18 U.S.C. §1957(a), and money laundering thru falsified invoices and financial instruments to conceal the true nature of proceeds derived from bribery in violation of 18 U.S.C. §1956.

136.    The aforementioned conspiracy to engage in a pattern of racketeering activity furthered the Defendants' conspiracy to bribe Iraqi officials in violation of the Foreign Corrupt Practices Act and enabled the Defendants to continue to conspire to surreptitiously pay such bribes with the intention of securing an exclusive market which would exclude American growers and cause direct economic injury to the Plaintiffs and Plaintiffs' class.

137.    The combined business efforts of the Defendants constitute an ongoing Enterprise as that term is defined by RICO.  The Enterprise is an ongoing organization that

continues to function as a unit and engage in activity separate and apart from the criminal and illegal activity. The Enterprise operated, and continues to operate, legitimate business, which includes business in the United States.

138.    Defendant AWB, AWB USA and the Individual Defendants together with the co-conspiring Alia representative, Iraqi government representatives, BHP Billiton representatives, Yemenis government representative, Pakistani government representatives, Indonesian private citizens, etc. conspired to worked together oftentimes on a repeated and continuous basis to engage in the illegal racketeering activity. The predicate acts described above include conspiracy to bribe foreign officials, conspiracy to engage in monetary transactions with funds derived from bribery, and conspiracy to launder bribery proceeds in order to further and continue the goal of the Enterprise to exclude and harm the Plaintiffs and Plaintiffs' class.

139.    Defendants were and continue to be associated with and employed by the Enterprise.

140.    Defendants conspired to direct that employees employed by the Enterprise engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

141.    The Enterprise and the participating Defendants have in fact conspired to engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

142.    The Enterprise has earned billions of dollars in exchange for participating with co-conspiring government and private company officials in the racketeering activities described above. The Enterprise and the co-conspirators designed and implemented the AWB Unfair Competition Conspiracy in order to receive billions of dollars in wheat sales that would not have been received through the Enterprise's legitimate conduct of business.

143.    Plaintiff Switzer, Plaintiff Alexander, Plaintiff Bradshaw, Plaintiff Howard, Plaintiff Boyd, Plaintiff Haynie, and the members of the putative Plaintiff class have all been injured in their business or property, as required by 18 U.S.C. § 1964(c).  The impact caused by Defendants' conspiracy to engage in a pattern and practice of criminal conduct, if not remedied by the Court, will continue to harm the named Plaintiffs and putative RICO Class Members.

144.    The Enterprise's victims include all persons and/or concerns that have suffered direct economic and non-economic damages from the AWB Unfair Competition Conspiracy.

145.    As a direct and proximate result of the AWB Unfair Competition Conspirators' actions as aforesaid, individually named Plaintiffs and the putative RICO Class have been damaged in an amount to be determined at trial.

### COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS OPPORTUNITY AND ECONOMIC RELATIONSHIP

146.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

147.    Defendants intentional illegal actions wrongfully and tortiously interfered with Plaintiffs' and putative Class Plaintiffs' business opportunities and economic relationships, including but not limited to their opportunity to export wheat and earn income as a result, and to increase their stature and presence in specific wheat export markets.  As a direct and proximate result of said actions, Plaintiffs and putative Class Plaintiffs have been damaged in an amount to be determined at trial.

## RELIEF REQUESTED

### *DAMAGES*

148.    As a direct and proximate result of the aforementioned pattern of racketeering activity engaged in by the Defendants, the Plaintiffs and putative Class Plaintiffs have suffered economic damages, for which monetary damages to the full extent of the law are appropriate.

149.    In addition to recovering the aforementioned economic damages, Plaintiffs and putative class members are entitled to treble damages under RICO.

150.    Plaintiffs and putative class members are also entitled to recover attorney's fees and costs of litigation under RICO.

### *EQUITABLE RELIEF*

151.    At all times relevant herein, the Defendants have engaged in an ongoing pattern of racketeering activity acts designed to garner an illegal and unfair competitive advantage in specific wheat markets and to specifically cause harm to American growers. Defendants and their co-conspirators used bribery, money and property derived from bribery, money laundering of bribery proceeds, and other racketeering activities to carry out the conspiracy and obtain an unfair advantage in specific wheat markets to the economic disadvantage of Plaintiffs and putative class members.

152.    The Defendants continue to engage in this ongoing pattern and practice now by engaging in an attempted cover-up of the conspiracy by committing perjury and obstruction of justice during the investigations surrounding said conspiracy, namely the Volker Report and the Cole Commission.

153.    Plaintiffs are entitled to injunctive relief under RICO to prevent Defendants from continuing to engage in prohibited racketeering activities designed to enrich Defendants and injure the Plaintiffs and putative class members, and to prevent Defendants from continuing to profit from such conduct.

## PRAYER FOR RELIEF

154.    Plaintiffs and the members of the Plaintiffs' class are entitled to any and all remedies available to them as a result of the conduct alleged herein, including, but not limited to:

      a.      Compensatory damages to make them whole;

      b.      Treble damages under RICO;

      c.      Attorney's fees and costs under RICO;

      d.      Equitable, declaratory and injunctive relief as permitted by law; and

      e.      Any additional or alternative relief that may be appropriate under the circumstances.

Respectfully submitted,

THE LAW FIRM OF L. PALMER FORET, PC

By:_____
    L. Palmer Foret, Esquire
    D.C. Bar No.260356
    1735 20th Street, N.W.
    Washington, D.C.  20009
    (202) 332-2404 (Telephone)
    (202) 332-2808 (Facsimile)
    *Counsel for Plaintiffs*

EDMOND & JONES, LLP

Roderick E. Edmond
Ga. Bar No. 399476
Craig T. Jones
Ga. Bar No. 399476
127 Peachtree Street, NE, Suite 410
Atlanta, Georgia  30303
404 525-1080
*Counsel for Plaintiffs*
(to be admitted pro hac vice)

## JURY DEMAND

Plaintiff respectfully demands trial by jury on all issues raised herein.

By:_____
     L. Palmer Foret, Esquire